# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | Case No.: 2:20-cR-000270-MHH- |
| } | SGC-1 |
| **DEVON MARTEZ EASLEY,** } | |
| } | |
| **Defendant.** } | |
| } | |
| } | |

## MEMORANDUM OPINION AND ORDER

Defendant Devon Easley has moved several times for the Court to suppress evidence from the two traffic stops that generated the charges against him in this action. (Docs. 104, 110, 112, 122, 126, 185, 203). After Mr. Easley had the opportunity at a day-long suppression hearing to present evidence supporting his motion, (Doc. 170, pp. 37-38), the Court denied the motion, (Doc. 148, pp. 140-45).[1] After the Court denied Mr. Easley's motions to suppress, Mr. Easley filed a new motion to suppress. (Doc. 126). The Court deemed the new motion to suppress a

---

[1] As discussed in several opinions in this case, the Court began a hearing on Mr. Easley's original motion to suppress in April 2021. (Doc. 139). The Court suspended that hearing and ordered a psychiatric evaluation of Mr. Easley. (Doc. 139, p. 39; *see also* Doc. 56). After Mr. Easley returned from a BOP evaluation, the Court held an evidentiary hearing on Mr. Easley's then-pending suppression motions, and the Court began the testimony from scratch. (Doc. 148).

motion for reconsideration of the denial of Mr. Easley's preceding motions to suppress. (Doc. 170, pp. 37-40). This opinion addresses the motion to reconsider.[2]

### *Evidence Concerning Underlying Arrests*

Mr. Easley's first arrest in this case took place on the afternoon of January 26, 2020. Corporal Craig Fisher and Officer Khalil Brakes of the Mountain Brook Police Department received a dispatch call concerning a broken-down car on Highway 280 near Shades Creek Parkway. (Doc. 148, pp. 6, 27). Dispatch identified Mr. Easley as the registered owner of the vehicle and advised that he was a "possible probationer." (Doc. 148, p. 70).

The officers arrived at the scene a few minutes after they received the dispatch call and found a car sitting still in the far-right lane of a four-lane section of Highway 280. (Doc. 148, pp. 6-7, 10-11; GX1 - Dashcam video of stop). The car's engine was running, and the car was in Drive. (Doc. 148, pp. 9, 78; GX3). The driver, Mr.

---

[2] Mr. Easley argues that he should have a new suppression hearing because he did not have enough time to conduct research before his February 25, 2022 hearing, because his solitary confinement impacted his preparation for the hearing, and because he was not able to talk to standby counsel while he was in solitary confinement. (Doc. 122; Doc. 170, pp. 35-36). The Court is not persuaded by these arguments. The record reflects that, despite his confinement, Mr. Easley had ample time to prepare for his evidentiary hearing. Though Mr. Easley indicated before the hearing that he would allow his then-standby attorney to take the lead in the hearing, Mr. Easley interjected frequently and advanced several arguments during the hearing that reflected his level of preparation. Moreover, the record contains a substantial amount of video evidence that speaks for itself. Since his February 2022 evidentiary hearing, Mr. Easley has had multiple opportunities to develop his arguments for exclusion of the evidence against him both in writing and in hearings in court.

Easley, was slumped over in the driver's seat with a marijuana joint in his right hand. (Doc. 148, pp. 11, 20-21, 29, 35-36, 74; GX1 (audio of Officer Brakes reporting to dispatch that driver was slumped over); *see also* Doc. 148, pp. 96-97).[3] The car doors were locked, but the driver's-side window was cracked, so Cpl. Fisher reached through the window, unlocked the car, opened the driver's-side door, put the vehicle in park, and removed the key from the ignition. (Doc. 148, p. 11).

As Cpl. Fisher removed the keys from the car, Mr. Easley began to awaken. (Doc. 148, p. 12; GX3). Cpl. Fisher's dashcam video captures a driver who was disoriented or impaired. (GX3; Doc. 148, pp. 101-02). Because Mr. Easley appeared disoriented, the officers called for medics. (Doc. 148, p. 14; Doc. 113-1; GX3). Mr. Easley indicated that he had not had anything to eat or drink that day.

---

[3] A photo of the joint taken from Cpl. Fisher's dashcam video is not very clear, but it appears that Officer Brakes is holding a joint. (Doc. 114-3). Officer Brakes saw the joint in Mr. Easley's hands; Cpl. Fisher did not see the joint in Mr. Easley's hand. (Doc. 148, p. 75). At 5:20 in Cpl. Fisher's body cam footage, Officer Brakes mentioned that he saw the joint in plain view. (Doc. 148, pp. 74-75, 78, 144; GX3). Cpl. Fisher testified that he did not smell marijuana when he first approached the passenger side of Mr. Easley's car even though the window was open. (Doc. 148, pp. 72, 77). Cpl. Fisher testified that he smelled marijuana when he walked around to the driver's side of the vehicle, but he did not mention the odor to Mr. Easley when he asked Mr. Easley to step out of his car. (Doc. 148, pp. 36, 72). The police report for the stop mentions the joint but not the odor of marijuana. (Doc. 148, pp. 72-73).

Officer Brakes did not appear at the February 25, 2022 suppression hearing. (Doc. 148, pp. 26, 29, 31). Officer Brakes's body cam recording did not begin until after Mr. Easley stepped out of his car and moved to the side of the highway for medics to examine him, so Officer Brakes's body cam recording does not capture what he saw when he first approached Mr. Easley's car. (Doc. 148, p. 38).

To impeach Cpl. Fisher, Mr. Easley's stand-by counsel asked Cpl. Fisher about a period during which he was demoted as discipline for a premature misdemeanor arrest. (Doc. 148, pp. 28-29).

(Doc. 148, p. 30). Corporal Fisher and Officer Brakes repeatedly asked Mr. Easley to step out of the car. (Doc. 148, p. 15; GX3). After a few minutes, Mr. Easley complied, and Officer Brakes walked him to the rear of the vehicle. (Doc. 148, p. 15; GX3). The officers asked Mr. Easley if he had a weapon, and he acknowledged that he had a pistol. Officer Brakes retrieved the pistol; it was loaded. (Doc. 148, p. 16; GX3). Mr. Easley volunteered that he was on probation. (Doc. 148, p. 40; GX3). Officer Brakes asked Mr. Easley if he had a pistol permit; Mr. Easley said he didn't. (Doc. 148, p. 17; GX3). When Officer Brakes asked the question, he and Cpl. Fisher were the only law enforcement officers at the scene. (Doc. 148, pp. 84-85). Neither Cpl. Fisher nor Officer Brakes advised Mr. Easley of his *Miranda* rights. (Doc. 148, p. 31).

After medics cleared Mr. Easley, Officer Brakes performed a sobriety test. Mr. Easley did not pass. (Doc. 148, pp. 18-20; GX7).[4] The officers arrested Mr. Easley for DUI, possession of marijuana, and possession of a pistol without a permit. (Doc. 148, p. 20).

---

[4] Officer Brakes administered a horizontal gaze test and a walk and turn test. Cpl. Fisher's vantage point did not permit him to observe the first test, but he observed the second. Cpl. Fisher testified that Officer Brakes's instructions to Mr. Easley were accurate and that Mr. Easley was on a slight uphill slope when he took the test. (Doc. 148, pp. 32-33). A breathalyzer alcohol test registered .00. (Doc. 148, p. 34).

Because they arrested Mr. Easley, the Mountain Brook officers arranged to tow his car and conducted an inventory search of the vehicle.[5] The officers collected the marijuana joint, (Doc. 114-3), and found other drugs and a pistol underneath the driver's seat. (Doc. 148, p. 23). [6]

Mr. Easley's second arrest in this case took place on February 9, 2020, at approximately 10:30 p.m. Birmingham police officers responded to a call about a suspicious person parked at a closed KFC restaurant at 1945 Bessemer Road in Ensley. (Doc. 148, p. 110). Initially, Corporal Curtis Norris responded to the call. When Cpl. Norris arrived at the scene, he saw the vehicle, ran the license plate, and learned that the vehicle was registered to Mr. Easley. (Doc. 148, p. 111). Cpl. Norris also learned that Mr. Easley had an outstanding federal arrest warrant. (Doc. 148, p. 111). Cpl. Norris approached the driver's side of the vehicle and positively identified Mr. Easley as the occupant of the vehicle when Mr. Easley provided his driver's license. (Doc. 148, pp. 111-12, 131).

Cpl. Norris and the second officer to arrive on the scene, Cpl. Voltz, tried to get Mr. Easley to step out of his car. Mr. Easley refused. (Doc. 148, p. 113). When

---

[5] Officer Brakes conducted the search. (Doc. 148, pp. 22, 54). Cpl. Fisher described the search as a search incident to arrest. Officer Fisher testified that if a family member had been with Mr. Easley, he would not have allowed the family member to remove the vehicle from the scene, as opposed to having the car towed, because Mr. Easley was not simply driving without a license; the police believed there was probable cause to arrest him because of the marijuana joint, and the police could have the vehicle towed incident to Mr. Easley's arrest. (Doc. 148, pp. 53-57).

[6] The officers collected the blunt at 4:14 p.m. (Doc. 114-3).

Cpl. Voltz approached the passenger side of Mr. Easley's car, he saw marijuana on the passenger's seat. (Doc. 148, pp. 115, 131; GX9). Over the course of 20 to 30 minutes, as Cpl. Norris and Cpl. Voltz tried to coax Mr. Easley to step out of his car, several additional officers arrived, three of whom were sergeants. (Doc. 148, p. 116). The officers informed Mr. Easley that they might have to break his window to forcibly remove him from his car. (Doc. 148, p. 116). At one point, Cpl. Norris falsely told Mr. Easley that he would not arrest him if he would get out of the car; Cpl. Norris knew he would, in fact, arrest Mr. Easley on the federal warrant when Mr. Easley emerged from his car. (Doc. 148, pp. 120, 122-23).

When Mr. Easley finally exited his car, the Birmingham police arrested him. (Doc. 148, p. 117). The officers then conducted a pre-tow inventory search and found narcotics and a handgun in the vehicle. (Doc. 148, p. 117).

*Discussion*

Mr. Easley argues that the police who arrested him violated his rights under the Fourth, Fifth, Sixth, Seventh, Eighth, and Fourteenth Amendments, and he asks the Court to suppress the incriminating evidence found incident to those arrests. (Doc. 201, p. 44). The Court will examine Mr. Easley's arguments concerning the Mountain Brook stop first and then consider Mr. Easley's arguments concerning the Birmingham stop.

Before turning to Mr. Easley's specific arguments for relief, several general principles bear mention. First, "suppression is not an automatic consequence of a [constitutional] violation." *Herring v. U.S.*, 555 U.S. 135, 137 (2009). "Instead, the question turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct." *Herring*, 555 U.S. at 137. "Indeed, exclusion 'has always been our last resort, not our first impulse.'" *Herring*, 555 U.S. at 140 (quoting *Hudson v. Michigan,* 547 U.S. 586, 591 (2006)). A court may exclude evidence only to deter future police misconduct, and a court must determine that the benefit of the deterrent impact of exclusion of evidence outweighs the costs of deterrence. *Herring*, 555 U.S. at 141. "The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free—something that 'offends basic concepts of the criminal justice system.'" *Herring*, 555 U.S. at 141 (quoting *U.S. v. Leon,* 468 U.S. 897, 908 (1984)). "The extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct." *Herring*, 555 U.S. at 143.

Turning to the Mountain Brook arrest, Mr. Easley's principal argument is that Officer Brakes should have advised him of his *Miranda* rights before asking him if he had a pistol permit. Inherent in Mr. Easley's argument is his assumption that, were it not for him acknowledging that he did not have a permit for the gun he was carrying, the police would have lacked probable cause to arrest him and, therefore,

would not have had a reason to impound his car and conduct an inventory search or a search incident to arrest. Mr. Easley argues that the warrantless search of his car violated his rights under the Fourth Amendment.

"The Fourth Amendment provides that '[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated.' U.S. Const. amend. IV." *U.S. v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012). "It is by now axiomatic that a court must examine the totality of the circumstances in order to determine whether a search or seizure is reasonable under the Fourth Amendment." *Lewis*, 674 F.3d at 1303 (citing *Samson v. California*, 547 U.S. 843, 848 (2006)). "Subjective intentions" of police officers "play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. U.S.*, 517 U.S. 806, 813 (1996).

Reasonable officers, knowing what Cpl. Fisher and Officer Brakes knew, would have had sufficient information to arrest Mr. Easley before Officer Brakes learned that Mr. Easley was carrying a gun without a permit. Therefore, the absence of a *Miranda* warning is not relevant to Mr. Easley's arrest and resulting search. Cpl. Fisher and Officer Brakes encountered an individual who did not react when Cpl. Fisher reached through an open window, unlocked the car doors, and opened the driver's-side door of a car in Drive in a lane of traffic on a busy highway. The driver showed signs of consciousness only as Cpl. Fisher turned off the car. As the

driver "awakened" (for lack of a better word) to his circumstances, he was disoriented, and his speech was slurred. (GX3, 3:05). Just over five minutes into the stop, Officer Brakes indicated to Cpl. Fisher that he saw a blunt in Mr. Easley's car. (GX3, 5:20). Just over seven minutes into the stop, the officers had decided that they were going to detain Mr. Easley and that he was not free to leave. (GX3, 7:25), and seconds later, Mr. Easley volunteered that he was on probation, (GX3, 7:40), a possibility that dispatch had raised when Officer Brakes ran Mr. Easley's license plate number, (GX1). A disoriented, armed probationer who stops his vehicle in a lane of highway traffic with a blunt in plain sight supplies probable cause for a reasonable police officer to arrest him. Sgt. Loring said as much when he watched Cpl. Fisher's bodycam recording.[7] Because the police had probable cause to arrest Mr. Easley before Officer Brakes asked him about a gun permit, the permit question, even if improper, is irrelevant to Mr. Easley's arrest and the pre-tow inventory incident to arrest.[8] *See Colorado v. Bertine*, 479 U.S. 367, 371 (1981)

---

[7] The Court rests this analysis on Officer Brakes's report that he saw a blunt, not on Cpl. Fisher's testimony that he smelled marijuana.

[8] As the Court discussed during Mr. Easley's suppression hearing, it is not clear that Mr. Easley was entitled to a *Miranda* warning on the record in this case. *Berkemer v. McCarty*, 468 U.S. 420 (1984). The Court need not decide the issue to resolve Mr. Easley's suppression motion. Just as the absence of a *Miranda* warning is not relevant to Mr. Easley's challenge to the Mountain Brook arrest and search, possible flaws in the sobriety tests that Officer Brakes conducted after he asked Mr. Easley about a gun permit are not relevant.

("[I]nventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment.").

Even were that not the case, Mr. Easley's argument for exclusion of the evidence found in the search of his car still would fail because, at worst, Mr. Easley has established that Officer Brakes was negligent when he asked Mr. Easley if he had a permit for his firearm without first advising Mr. Easley of his *Miranda* rights. On the day of Mr. Easley's arrest, Officer Brakes was in training. (Doc. 148, p. 5). Officer Brakes asked Mr. Easley whether he had a permit for his gun before Cpl. Fisher, the field training officer, could intervene. There is no evidence that a trained officer intentionally or recklessly interrogated Mr. Easley without first advising him of his *Miranda* rights. Moreover, through the evidence that Mr. Easley introduced of Cpl. Fisher's past discipline, the record demonstrates that the Mountain Brook Police take officer mistakes seriously and impose discipline independent of court action. (Doc. 148, pp. 28-29). Absent culpable police conduct and a record that indicates a need for deterrence, the Court may not exclude evidence of criminal conduct on the record in this case. *Herring*, 555 U.S. at 141-43.

Mr. Easley's arguments concerning his arrest by Birmingham police officers fare no better. Mr. Easley contends that there was no probable cause for the stop because it was not illegal for him to park in the lot of a closed restaurant. (Doc. 112). He also argues that nothing he did after police arrived established probable

cause for an arrest. Mr. Easley points out that he merely rolled up his car windows after giving Corporal Norris his identification, declined to get out of his vehicle, and declined to identify who he was planning to meet at the restaurant. Mr. Easley argues that though Cpl. Voltz stated that he saw marijuana in the passenger seat of Mr. Easley's car, there was no "factual hardcore evidence" in bodycam footage or elsewhere to confirm the presence of marijuana. (Doc. 112).

All of that is true, but Mr. Easley omits from his analysis the facts most salient to the stop and arrest by Birmingham police officers. At approximately 10:40 p.m., Cpl. Norris was dispatched to a closed KFC because someone working in the closed restaurant called the police to report a suspicious car in the parking lot. (Doc. 148, p. 110). That late-night, after-hours report of suspicious activity from a business establishment was sufficient to allow Cpl. Norris to begin an investigatory stop. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (explaining that a law enforcement officer may conduct a brief, investigatory stop of an individual if there is a "reasonable, articulable suspicion that criminal activity is afoot"); *Navarette v. California*, 572 U.S. 393, 398-99 (2014) (police officer may initiate a stop based on a reliable 911 call). Before Cpl. Norris approached the car, he ran the license plate on the suspicious vehicle and learned that the car was registered to Mr. Easley and that there was a federal warrant for Mr. Easley's arrest. (Doc. 148, p. 111).

When Cpl. Norris approached the car, he positively identified Mr. Easley as the driver, (Doc. 148, p. 111), establishing a basis for Mr. Easley's arrest on the outstanding warrant. *Williams v. Aguirre*, 965 F.3d 1147, 1162 (11th Cir. 2020) ("In the context of arrest warrants," a police officer "ordinarily does not violate the Fourth Amendment when he executes a facially valid arrest warrant, regardless of whether the facts known to the officer support probable cause."); *see Utah v. Strieff*, 579 U.S. 232, 233 (2016) ("That warrant authorized Officer Fackrell to arrest Strieff, and once the arrest was authorized, his search of Strieff incident to that arrest was undisputedly lawful."). Mr. Easley has offered no evidence that suggests that the warrant for his arrest was constitutionally inadequate.[9] Because the outstanding arrest warrant authorized Cpl. Norris to arrest Mr. Easley, nothing that happened after Mr. Easley's positive identification – not Mr. Easley's refusal to leave his car for upwards of 15 minutes nor the possible presence of marijuana in the car – matters in the analysis of Mr. Easley's arrest by Birmingham police.

Mr. Easley argues that the police did not inform him of the arrest warrant when they asked him to exit his car. (Doc. 112). He also contends that Cpl. Norris misled him when he stated that he "would work something out" with Mr. Easley and that he would not take Mr. Easley to jail if he got out of the car. (Doc. 112, p. 7).

---

[9] The federal warrant concerned Mr. Easley's grand jury indictment for the Mountain Brook arrest. (Doc. 111, p. 2, n. 3).

Mr. Easley argues that Corporal Norris should have "stood by his word as he [is] sworn to do and let me go." (Doc. 112, p. 7).

Cpl. Norris did not have to tell Mr. Easley that there was a federal warrant for his arrest; "officers are entitled to be silent about their motivations." *United States v. Spivey*, 861 F.3d 1207, 1215 (11th Cir. 2017). Were this a case in which Cpl. Norris was trying to obtain Mr. Easley's consent for a voluntary search of his vehicle, Cpl. Norris's representation to Mr. Easley that they could work something out if Mr. Easley exited his car might be a factor in assessing whether Mr. Easley's consent was volitional. *Spivey*, 861 F.3d at 1213. But even under a Fourth or Fifth Amendment analysis of volitional conduct, police deception is acceptable if the deception does not override the defendant's will. *Spivey*, 861 F.3d at 1214, 1218. Here, Cpl. Norris was not trying to persuade Mr. Easley to consent to a search of his car or to make a voluntary statement. Cpl. Norris was trying to get Mr. Easley to step out of his car so that the police would not have to break a window to remove him from the vehicle. (Doc. 148, p. 116). The Court has found no authority that suggests that Cpl. Norris's misleading statement gives rise to a constitutional violation that overrides an arrest pursuant to a valid warrant.

Because there was a lawful basis for Cpl. Norris to arrest Mr. Easley, the Birmingham police properly impounded Mr. Easley's car and conducted a pre-tow inventory of the car that produced incriminating evidence. As noted with respect to

the Mountain Brook arrest, pre-tow inventories of legally impounded vehicles conducted pursuant to an established procedure are reasonable under the Fourth Amendment. *See South Dakota v. Opperman*, 428 U.S. 364, 372 (1976); *see Florida v. Wells*, 495 U.S. 1, 4 (1990) ("standardized criteria or established routine must regulate the opening of all containers found during inventory searches"). Per standard policy, the Birmingham Police Department tows cars through Weil Wrecker, and officers make a pre-tow inventory of a car. (Doc. 148, p. 117). Thus, the Birmingham Police acted consistent with standard policy when they towed Mr. Easley's car. Therefore, the evidence found in the car is not subject to exclusion because Mr. Easley has not established a constitutional violation.

## *Conclusion*

For the forgoing reasons, the Court denies Mr. Easley's request for the Court to reconsider the order denying his motions to suppress. The Court asks the Clerk to please TERM Docs. 122 and 150 and to please mail a copy of this order and a copy of the docket sheet to Mr. Easley.

**DONE** and **ORDERED** this August 3, 2022.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE